AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court
## For The District of Columbia

**UNITED STATES OF AMERICA**

v.

### CRIMINAL COMPLAINT

**Zhenli YE GON, aka Zhenli YE, aka Charley YE**
**DOB:**
**PDID:**

**CASE NUMBER:**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.   On or about   __from December 2005 through March 2007__  in various countries, including México, China, and the United States, defendant did,

unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with other co-conspirators known and unknown to the Government, to aid and abet in the manufacture or distribution of five-hundred grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, intending and knowing that it would be unlawfully imported into the United States from México, and elsewhere, outside of the United States

in violation of Title 21, United States Code, Sections 959, 963 and 960, and Title 18, United States Code, Section 2.

I further state that I am   __Special Agent Eduardo A. Chavez__  , and that this complaint is based on the following facts:
**SEE ATTACHED AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT**

Continued on the attached sheet and made a part hereof:             ☒ Yes ☐ No

_____
Signature of Complainant
**SPECIAL AGENT EDUARDO A. CHAVEZ**
**DRUG ENFORCEMENT ADMINISTRATION**

Sworn to before me and subscribed in my presence,

At          __Washington, D.C.__          .
City and State

__June 15, 2007__          .
Date

_____          _____
The Honorable John M. Facciola          Signature of U.S. Magistrate Judge
United States Magistrate Judge

**AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT
FOR ZHENLI YE GON**

I, Eduardo A. Chávez, Special Agent, Drug Enforcement Administration, United States
Department of Justice, being duly sworn, do depose and state:

1.       I have been employed as a Special Agent (SA) with the Drug Enforcement
Administration (DEA) since July 2000 and am presently assigned to the Drug Enforcement
Administration, México City Country Office in México City, México.  I am a law enforcement
officer of the United States within the meaning of Title 18, United States Code §2510(7), who is
empowered to conduct investigations of, and make arrests for, narcotic offenses enumerated in
Title 18, United States Code §2516.  I have successfully completed a sixteen (16) week DEA
Basic Agent Training Academy at the DEA Academy in Quantico, Virginia.  This training
included instruction in the investigation of federal drug and money laundering crimes, including,
but not limited to Title 21, United States Code §§841, 846, and 959, and Title 18, United States
Code §§2, 1956 and 1957.  I have discussed with numerous law enforcement officers,
defendants, and informants, the methods and practices used by chemical and narcotic
distributors.  I have acted in an undercover capacity conducting multiple chemical and
methamphetamine transactions and have been the affiant on numerous federal and state search
warrants, complaints, and wiretap affidavits and have testified in court in the area of narcotics on
several occasions.

2.       The facts set forth in this Affidavit are known to me as a result of my investigation and
interview with agents and law enforcement officers.  These are not all the facts known to me
throughout the course of this investigation, but rather only those which are essential to establish
probable cause for charging a complaint against Zhenli YE GON for the federal violations listed
here.

**CHEMICALS AND DRUGS INVOLVED**

3.       Pseudoephedrine/ephedrine are legitimate pharmaceutical chemicals which are
commonly used in cold and allergy medicines.  In the United States, pseudoephedrine/ephedrine,
its salts, isomers, and salts of isomers are considered List I chemicals as defined by 21 USC
§802(34) and 21 CFR §1310.02(a)(3)(11) .  List I chemicals are those which are deemed
important to the clandestine manufacture of controlled substances, including methamphetamine.

N-Acetylpseudoephedrine is a derivative of pseudoephedrine and while not controlled in the United States, it is controlled in México by the Mexican General Law of Health. N-Acetylpseudoephedrine can be converted back into pseudoephedrine/ephedrine through a chemical process.

4.      Methamphetamine is a Schedule II controlled substance as defined by 21 USC §811(a) and 21 CFR §1308.12(d)(2). Methamphetamine is an addictive synthetic stimulant that affects the central nervous system and can be ingested orally, by smoking, snorting, or injecting. Methamphetamine releases high levels of dopamine which stimulate brain cells and enhances body mood and movement.

## PROBABLE CAUSE

5.      The DEA México City Country Office (referred to as the DEA MCCO) in joint cooperation with the Mexican Attorney General's Office Organized Crime Unit (referred to by its Spanish acronym "PGR/SIEDO") has been investigating the illicit importation and diversion of precursor chemicals, particularly pseudoephedrine, by a pharmaceutical wholesaler company named UNIMED PHARMCHEM MEXICO, SA DE CV (referred to as UNIMED) and its owner, Zhenli YE GON, located in México City, México.

6.      Investigation revealed that UNIMED had imported approximately 20 and 29.4 metric tons of "N-Methyl-Acetylamino" on December 12, 2005, and January 6, 2006, respectively; and 37.485 metric tons of "Hydroxy-Benzyl-N-Methyl-Acetethamine" on both August 28, 2006, and September 2, 2006, into México.

7.      According to documentation provided to Mexican Customs by UNIMED, N-Methyl-Acetylamino is a pharmaceutical intermediate chemical used in analgesic product manufacture. Hydroxy-Benzyl-N-Methyl-Acetethamine was also identified as a pharmaceutical intermediate; however documents did not describe any specific use.

8.      However, according to conversations with DEA Forensic Chemists (FC), N-Methyl-Acetylamino can be considered a partial chemical name; however, the chemical does not exist as it was listed on UNIMED's shipping manifests nor can it be identified as an intermediate product for analgesic production. DEA FCs also stated that Hydroxy-Benzyl-N-Methyl-Acetethamine does not correspond to any known chemical.

9.      On December 5, 2006, UNIMED once again attempted to import 19.797 metric tons of Hydroxy-Benzyl-N-Methyl-Acetethamine which was flagged for inspection by Mexican

Customs at the Pacific seaport of Lázaro Cárdenas, México.  A sampling of the substance conducted by the Mexican Customs' Central Laboratory identified it as N-Acetylpseudoephedrine, a derivative of pseudoephedrine/ephedrine.  This substance is controlled by Mexican federal health law as well as Mexican federal precursor law making it illegal for UNIMED to import.

10.     On April 26, 2007, DEA FC and I traveled to the UNIMED manufacturing plant to analyze any chemicals or residues still present.  This plant had been secured by Mexican authorities since the execution of their federal search warrant on March 15, 2007, to be discussed in detail herein.  DEA FCs took samples of chemical residue found in equipment and locations throughout the site, including samples which tested positive for the presence of ephedrine.  It is believed the plant was used for the production of pseudoephedrine/ephedrine using an N-Acetyl derivative as the starting material.

11.     I know based on my conversations with Mexican federal prosecutors and health officials that after 2005, UNIMED pharmaceutical did not have any authority to import, manufacture, distribute, or possess any pseudoephedrine or ephedrine related material.  Based on the expert conclusions drawn by the DEA FCs and the importation records of the N-Methyl-Acetylamino and the Hydroxy-Benzyl-N-Methylacetethamine, I believe based on the mislabeling of shipments and positive results for the presence of ephedrine, that YE GON willfully intended to import a restricted chemical into México, violating Mexican law, for the express purpose of manufacturing pseudoephedrine/ephedrine, a listed chemical, as defined by Title 21 United States Code Section 802(34).

12.     In consultation and interviews with current and former advisors to the Mexican Federal Commission for the Protection Against Sanitary Risks (hereafter referred to by its Spanish acronym, "COFEPRIS"), they stated that UNIMED, as a pharmaceutical wholesaler, did not have any legal authority to import, export, manufacture, or distribute and product containing pseudoephedrine or ephedrine.  COFEPRIS also indicated that all legitimate pharmaceutical laboratories operating in México must go through COFEPRIS to obtain permits to buy and/or sell pseudoephedrine/ephedrine.  This Commission is charged with oversight and regulatory control over all pseudoephedrine/ephedrine, imports, exports, and distribution within Mexican territory.

13.     Based on the aforementioned information, it is clear that YE GON and UNIMED

intentionally imported and manufactured pseudoephedrine/ephedrine for illegal purposes due to the fact that 1) UNIMED did not have the proper authority to import, export, distribute, or posses any such product and 2)no legitimate pharmaceutical manufacturer would risk criminal liability in purchasing such products from UNIMED.  Thus, I believe these large quantities of pseudoephedrine/ephedrine from the start were destined for the only other market which would require such quantities:  the clandestine methamphetamine manufacturing market.

14.     I know based on my training, experience, and conversations with other law enforcement officials both in the United States and México, clandestine methamphetamine laboratories over the past three years have increased significantly in México while decreasing in the United States. This has been due to tighter international regulations on the control of precursor chemicals such as pseudoephedrine/ephedrine, and aggressive law enforcement activity in the United States against clandestine methamphetamine laboratories.

15.     In approximately 2004, the United States saw a significant increase in methamphetamine seized at the United States-México border indicating that more methamphetamine is coming from México to the United States.  This coincides with Mexican intelligence which identifies a larger clandestine methamphetamine laboratory presence, including recent seizures in 2006 of the two largest clandestine methamphetamine laboratories in the Western Hemisphere.[1] Investigation into these clandestine methamphetamine laboratories identified links which conclude that that methamphetamine produced there was ultimately destined for the United States.  Additionally, these laboratories were located along traditional transportation routes used by Mexican traffickers to transport drugs to the United States.

16.     Also in 2004, México undertook aggressive measures to apply existing law for precursor chemicals to dampen what was suspected to be large amounts of criminal diversion, particularly that of pseudoephedrine and ephedrine for clandestine methamphetamine laboratories.  While it always has been illegal to import and divert pseudoephedrine/ephedrine, Mexican authorities applied sections of the law which allowed only pharmaceutical laboratories, not wholesalers, access to deal in pseudoephedrine/ephedrine under tight, documented regulations.  These steps had the effect of creating a lucrative black market for pseudoephedrine/ephedrine amongst methamphetamine manufacturers.

---

1 Both clandestine laboratories were discovered on the outskirts of Guadalajara, Jalisco, México, in January 2006 and December 2006.  Combined, these laboratories were capable of producing thousands of pounds of methamphetamine on a regular basis.

Potential Illicit Earnings

17.     I know based on my training and experience, conversations with DEA FCs, other DEA SAs, and the evidence mentioned herein, that N-Acetylpseudoephedrine is a derivative of pseudoephedrine/ephedrine that can be converted back into pseudoephedrine/ephedrine at a conservative ratio of approximately 1:0.6 (i.e. one pound of N-Acetylpseudoephedrine would yield 0.6 pounds of pure pseudoephedrine/ephedrine).  At this rate, YE GON and UNIMED's total importations of suspected N-Acetylpseudoephedrine totaled approximately 86.885 metric tons which conservatively converts into approximately 52,240 kilograms of pseudoephedrine/ephedrine.  I also know based on my training, experience, and increased clandestine methamphetamine laboratory activity in México, that this illegal importation is likely for the manufacture of methamphetamine.  Based on my experience and conversations with DEA FCs, a conservative yield of methamphetamine is at least 70% of the amount of pseudoephedrine/ephedrine used, thus potentially producing an amount of approximately 36,568 kilograms of pure methamphetamine.

18.     Furthermore, based on my training and experience, the current black market prices for one kilogram of pseudoephedrine/ephedrine in México is approximately $3,200 to $4,000 USD and prices for a kilogram of methamphetamine in the United States is $17,600 to $22,000 USD. Therefore, the suspected sale of UNIMED's illegal importations of N-Acetylpseudoephedrine could have resulted in an average monetary gain of approximately $188,064,000 USD. Anticipated future sales of methamphetamine in the United States would yield approximately $724,046,400 USD.

Enforcement Activity in México

19.     In early March, PGR/SIEDO solicited and received authorization to execute federal search warrants at YE GON's residence, UNIMED's corporate headquarters, both in México City, and UNIMED's pharmaceutical plant, located in Toluca, México.

20.     Upon execution of the search warrant at YE GON's residence, PGR/SIEDO federal prosecutors and agents identified $205,564,763 in US Dollars; $39,010 in U.S. traveler's checks; and approximately another $2,000,000 US dollars worth of various foreign currencies, hidden in various compartments, false walls, suitcases, and closets.  Based on my training and experience, I know that drug and chemical traffickers routinely collect large amounts of bulk cash from their illicit activity and store it while the money slowly gets introduced into the legitimate market.

21.    Additionally, jewelry and luxury vehicles purchased for or by YE GON, were located and seized, many of which included receipts indicating payment in US dollars to stores in the United States.  Furthermore, documentation from various Las Vegas, Nevada, casinos including player's club identifications and purchases from designer stores within Las Vegas casinos were located and seized.  Seven weapons were also located and seized including multiple handguns, a fully automatic AK-47 assault rifle, and multiple boxes of ammunition.

22.    Following the execution of the federal search warrant at UNIMED's corporate headquarters, federal attorneys and agents located and seized an additional $111,000 USD as well as documentation regarding several bank accounts located in the United States, China, and Hong Kong, as well as wire transfer confirmation pages from *casas de cambios* to banks throughout the United States and Europe.[2]

23.    Also found was a handwritten note addressed to YE GON in Spanish with the following text, "Zhenli, I hope that you are fine, due to the detention of the flour, my associates and I had some problems and had to spend the three books that you provided us.  I am fine now and have contact with customs.  Call me to work."  The note contained a cellular telephone number and was signed "Amigos".[3]  I am a fluent Spanish speaker, reader, and writer, and based on my training and experience, I know it is common among drug traffickers to use code words to attempt to disguise their illicit activity.  Based on my training and experience as an undercover agent and applying that expertise to this document, I believe "flour" maybe a code word for N-Acetylpseudoephedrine seized in December 2006 and "books" may refer to the money that YE GON had provided these individuals.  The writer makes reference to having "contact with customs", possibly referring to a cooperating individual within customs who can facilitate future movements of illicit goods.

24.    Based on the aforementioned history of illegal precursor importations; UNIMED's explicit intent to manufacture pseudoephedrine/ephedrine; the absence of a legitimate market for

---

2 *Casas de cambios* are Mexican money exchange houses which are used legitimately to convert currencies and wire money both domestic and internationally.  From a law enforcement standpoint, these *casa de cambios* have been widely used by drug trafficking organizations in México and South America to insert their illegal drug proceeds into the legitimate world financial systems in an attempt to disguise the origin of the money and launder its criminal history.  In this case records indicate that money brought to these exchange houses by YE GON or on his behalf were in U.S. dollars and not for exchange, but rather for wire transfers to various U.S. and European banks accounts.
3 The original Spanish text of the note reads:  *Zhenlin:  Espero que se encuentre bien, a raíz de que detuvieron la harina, mis compañeros y yo tenemos algunos problemas por lo que tuvimos que gastar los tres libros que nos obsequio, ahorita ya estoy bien y tengo contacto en la aduana.  Lamame para trabajar.  Celular 0445529575116. \*\*\*Atte AMIGOS*"

YE GON to sell the illegally manufactured pseudoephedrine/ephedrine, the substantial potential illicit profit earned by selling to drug traffickers; the amount of cash, luxury vehicles, jewelry, and weapons found during the search warrants; and also based on my training and experience, I believe Zhenli YE GON was using his company, UNIMED PHARMCHEM MEXICO, SA DE CV, to illegally import pseudoephedrine/ephedrine derivatives for future manufacture of pseudoephedrine/ephedrine in order to sell this restricted precursor to illicit methamphetamine manufacturing organizations operating in México for ultimate distribution and consumption in the United States.

25.     Furthermore, investigation conducted by the DEA Las Vegas District Office led to an interview with a source of information (referred to as the SOI) who stated YE GON told the SOI that in March 2006, a Mexican organized crime group began blackmailing YE GON in México. According to YE GON, the group wanted to store cash at YE GON's residence in México City.

26.     In addition to storing cash, the group wanted YE GON to launder their money.  YE GON told the SOI that he knew the money in his house was "dirty money" and the proceeds of narcotics trafficking.  YE GON told the SOI that he continually received threats against himself and his family, so he believed that he had no choice but to launder the money.  YE GON told the SOI that the traffickers instructed him to use his bank accounts to send the money to Las Vegas where he could launder it.

27.     According to records obtained from various hotels and casinos in Las Vegas, NV, YE GON net gambling activity from 2004 to 2007 resulted in the loss of approximately more than $125,917,839 USD.

## CONCLUSION

28.     Based on the information in this Affidavit, I believe that YE GON illegally produced pseudoephedrine/ephedrine at his pharmaceutical plant in México in order to aid and abet clandestine methamphetamine manufacturers operating in México with the knowledge that the methamphetamine produced was ultimately destined for the United States.  I also believe that he was using the proceeds of these illegal profits to send to the United States where they could be used to gamble and purchase various assets in an attempt to disguise the criminal origin of such money.  Therefore I declare that probable cause exists to believe that Zhenli YE GON, did knowingly and intentionally combine, conspire, confederate, and agree with other co-conspirators known and unknown to the Government, to aid and abet in the manufacture of five-

hundred grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, intending and knowing that it would be unlawfully imported into the United States from México, and elsewhere, outside the United States in violation of Title 21, United States Code, Sections 959, 960, 963, and Title 18, United States Code, Section 2.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
                Eduardo A. Chávez
                Special Agent
                U.S. Drug Enforcement Administration